**E-FILED**
Thursday, 15 February, 2007  11:29:44 AM
Clerk, U.S. District Court, ILCD

## UNITED STATES  DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
### Urbana Division

|  |  |  |
|---|---|---|
| **DEBRA A. WILLIAMS and** | ) | |
| **HERMAN F. WILLIAMS, individually** | ) | |
| **and on behalf of their minor son,** | ) | |
| **HERMAN RASHAD WILLIAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | |
| | ) | |
| **CITY OF CHAMPAIGN, Champaign** | ) | |
| **County, Illinois, a municipal corporation,** | ) | **Case No. 04-2150** |
| **DENNIS BALTZELL, GARY LEIBACH,** | ) | |
| **RUSSELL BECK, RODNEY MITCHELL,** | ) | |
| **MICHAEL ASCHENBRENNER,** | ) | |
| **RICHARD WILBERG, DAVID SHAFFER,** | ) | |
| **TOD MYERS, SCOTT CARTER,** | ) | |
| **CHUCK CARTER, and** | ) | |
| **MYDATT SERVICES, INC., a foreign** | ) | |
| **corporation doing business as** | ) | |
| **Valor Security,** | ) | |
| **Defendants** | ) | |

## ORDER

In August 2004, Plaintiffs Debra Williams, Herman Williams, and Herman Rashad Williams filed a Complaint at Law (#1) against Defendants City of Champaign, Dennis Baltzell, Gary Leibach, Russell Beck, Rodney Mitchell, Michael Aschenbrenner, Richard Wilberg, David Shaffer, and Tod Myers, alleging violations of federal and state law.  In December 2005, Plaintiff filed an Amendment to Complaint at Law (#27) adding Defendants Scott Carter, Chuck Carter, and Mydatt Services, Inc., and alleging federal and state law claims as to those Defendants.  Federal jurisdiction is based on federal question pursuant to 28 U.S.C. § 1331.  The parties have consented to the exercise of jurisdiction by a United States Magistrate Judge.

In October 2006, Defendants City of Champaign, Baltzell, Leibach, Beck, Mitchell, Aschenbrenner, Wilberg, Shaffer, and Myers filed a Motion for Summary Judgment (#54).  After reviewing the parties' pleadings and memoranda and the evidence presented, this Court **GRANTS** Defendants' Motion for Summary Judgment **(#54)**.

## I.  Standard

Summary judgment is granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for summary judgment, the Court must decide, based on admissible evidence, whether any material dispute of fact exists that requires a trial.  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  The party seeking summary judgment bears the initial burden of showing that no such issue of material fact exists.  *Celotex,* 477 U.S. at 323.

The Court must draw all inferences in a light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986).  However, the nonmoving party may not rest upon mere allegations in the pleadings or upon conclusory statements in affidavits; rather, he must go beyond the pleadings and support his contentions with proper documentary evidence.  *Celotex,* 477 U.S. at 322-23.  A scintilla of evidence in support of the nonmovant's position is not sufficient to oppose successfully a summary judgment motion; "there must be evidence on which the jury could reasonably find for the [nonmovant]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of any element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.*  "In such a situation there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Id.*

## II.  Background

Plaintiffs Debra and Herman Williams are the parents of Plaintiff Herman Rashad Williams (hereinafter "Rashad").  Debra, Herman, and Rashad are African-American.  Debra and Herman have filed individually and on behalf of Rashad.  At relevant times, Defendants Baltzell, Leibach, Beck, Mitchell, Aschenbrenner, Wilberg, Shaffer, and Myers worked as police officers for the City of Champaign police department.  Defendants Chuck Carter and Scott Carter worked

2

as security guards for Mydatt Services and were working at Marketplace Mall on January 18, 2004.

## A.  Factual Background

The task of determining what proposed facts are disputed has been particularly time-consuming in this case because Plaintiff's "responses" to Defendants' proposed undisputed facts were often not responsive.  For example, Defendants' Paragraph 33 states as follows:

> Debra was told to walk out of the van backwards with her hands up.  (pp. 23-4, Ex. K)  Rather than walk backwards, however, Debra started walking forward because she was confused.  (p. 24, Ex. K)  Debra was escorted to the back of a police car.  (p. 24, Ex. K).

(#54, p. 9.)  Plaintiffs assert that this is a disputed fact, stating as follows:

> There were a lot of officers talking to Debra when she got out of the van.  They were telling her to get out slowly, hands up, don't move.  Debra didn't know what they were saying.  EXH. C p. 23.  Debra was escorted by one of the police officers to a police car and told to get in.  EXH. C p. 24.

(#63, p. 11.)  As another example, Defendants' Paragraph 75 states as follows:

> Herman does not know the names of any of the officers who had their guns drawn besides Sgt. Shaffer.  (p. 12, Ex. J)  The officers had guns out during "the time it took them to get all the passengers out of the vehicle" and handcuffed.  (pp. 16-7, Ex. J)

(#54, p. 14.)  Plaintiffs assert that this is a disputed fact, stating as follows:

> Herman observed about 5 or 6 officers with their guns drawn.  The officers never told him exactly why they stopped the Williams' van despite him asking several times.  Herman Williams Dep 11.

(#63, pp. 15-16.)  Neither of the responses quoted above cites a single fact that contradicts the statements in Defendants' Paragraphs 33 or 75.  Many of Plaintiffs' "responses" to Defendants' proposed undisputed facts are similarly unresponsive, essentially presenting argument instead of presenting facts that contradict Defendants' statements.

Plaintiffs have also at times seriously mischaracterized the evidence.  For example, in Paragraph 141, Plaintiffs state as follows:

> The description of the suspect *made available prior to the police stop* was 'black male, late twenties, early thirties, that this perpetrator had grabbed five dollars from these two juveniles and scared them into giving him money, and that they, Marketplace, had been having problems with this individual panhandling before.' EXH. I p. 14.

(#63, p. 27 (emphasis added); also p. 32, ¶ 41.)  The Court has reviewed the relevant portion of Plaintiffs' Exhibit I (Defendant Leibach's deposition) at page 14.  During that deposition, counsel asked Leibach whether "the information which was made available *at least to METCAD* prior to the stop of the vehicle included a description of the perpetrator as being a black male late twenties, early thirties, that this perpetrator had grabbed five dollars from these two juveniles and scared them into giving him money, and that they, Marketplace, had been having problems with this individual panhandling before . . . ."  (Leibach dep., p. 14 (emphasis added).)  Leibach *expressly* testified that he did not recall receiving that detailed description of the suspect *prior to* making the traffic stop.  (Leibach dep., p. 12.)  He recalled only knowing that the suspect was a black male.  Plaintiffs' characterization of this information as an undisputed material fact thus mischaracterizes the evidence regarding a significant issue in the case.

A proposed fact is not in dispute simply because a plaintiff lists that fact as "disputed."  It is certainly not disputed when supported only by evidence that has been mischaracterized.  Here, the Court has carefully reviewed the evidence, including both parties' references to particular testimony.  Where the Court has determined from its review that Plaintiffs have raised a genuine issue as to proposed facts, the Court has construed the facts and drawn all inferences in Plaintiffs' favor.  The Court has gathered the following facts from the evidence presented by the parties.

### 1. The Mall Incident

On January 18, 2004, Plaintiffs Debra, Rashad, and Anthony Thomas went to Marketplace Mall in Champaign, Illinois.  On that date, Rashad was fifteen years old and approximately six feet tall.  Anthony Thomas, Rashad's cousin, was fifteen years old, African-American, approximately five feet four inches tall, and had no facial hair.  They left the mall at

about 5:15 to 5:30 p.m. in Debra's black van which bore a license plate number of RASHAD8. Debra drove first to her mother's home where she visited briefly.  Then she drove to her home.

On January 18, 2004, at about 5:41 p.m., Defendant Chuck Carter called METCAD and talked to Brian Peddycourt, who was working as a call taker at that time.  Carter told Peddycourt that he had "just had a report of a fellow panhandling out here and then, uh, another officer just called me and the same guy robbed two people in the mall." (Peddycourt dep., p. 3.)  Carter told Peddycourt that the perpetrator was seen leaving in a van with license plate RASHAD8. (Peddycourt dep., pp. 4-5.)  Defendant Scott Carter also called METCAD and reported that a couple of girls said that "this guy has been asking them for money.  And I – we've had – we've run him out of here before."  (Peddycourt dep., p. 7.)  Scott Carter also reported the that the vehicle in question was a dark-colored newer minivan with a license plate RASHAD8 and that a black woman was in the minivan.  (Peddycourt dep., p. 7.)  Scott described the panhandler as a black male, probably late 20s, early 30s, fairly tall, about six feet one inch, thin build, wearing a long black coat and a black hat.  (Peddycourt dep., p. 8.)  Scott told Peddycourt that no weapons were involved and the panhandler scared the victims into giving him the money.  (Peddycourt dep., p. 9.)  The victims were who reported this information to the security guards were twelve and fourteen years old.  (Peddycourt dep., p. 9.)  The entire conversation between the security guards and Peddycourt was replayed during Mr. Peddycourt's deposition and is part of that deposition.

## 2.  The Report to METCAD and the Incident History Detail

Mr. Peddycourt testified that he was acting as call taker on January 18, 2004.  As part of that job, he answers phone calls and enters data from those calls at a console.  As call taker, Mr. Peddycourt does not record every word of the information he receives.  It is his job to find out the nature of the event at issue and enter the information into the terminal so that it is available to law enforcement agencies.  (Peddycourt dep., pp. 47, 22.)  The data that he enters into the computer is disseminated via the METCAD system and is available to be retrieved by dispatchers at various police agencies who then can broadcast relevant information to police officers.  Police officers have no direct contact with the call taker.  (Peddycourt dep., p. 23.)

Police officers may be able to access the text entered by the call taker that is available to the
dispatchers via mobile data terminals but it requires some effort and is not automatic.
(Peddycourt dep., p. 25.)

Between 17:42:20 and 17:47:36 (the times are computer-generated at the time the person
entering the data hits the "enter" key), Mr. Peddycourt entered the following information:

> 17:42:20 Text:  JO, susp left in a unk van lic/RASHAD8 left sb on Market
> \Comp: Chuck Carter-MPM sec.
> 17:42:20 MP Shopic today @ 16:01:26 (98 more)
> 17:42:31 Text: RP is getting all infor from another sec ofcr spking w/vict
> 17:43:28 Location: 2001 Kankakee Dr (NE Sec) \ Phone: 217/511-3177 Comp:
> VZW call
> 17:43:28 Text: Have sec ofcr spking w/vict on tx now.  Occ 10 ago.
> 17:43:46 Text: Sus veh drk colored newer mod mini van
> 17:44:37 Text: Susp was trying to get money from people, asked the 2 victs to
> help him push his van into a spot, they did and he grabbed $5 from them.
> 17:45:24 Text: Susp BM, Late 20's early 30's, thin/tall, lsw/long blk coat, blk hat.
> Also a hvy set bf in the van.  RP says they have been having prob's w/him panhan
> out here
> 17:45:47 Text: Sec is if of Man Alive in Bergners Wing
> 17:46:53 Text: Susp scared vict into giving him the $$$.  Vict are 12 and 14 YO
> 17:47:36 Comp: Chuck Carter-MPM sec –> Scott Carter Phone: –>493-5933
> 17:47:36 Comp: Scott Carter \Ph: 493-5933, No further information

(#64-7, p. 24.)  This information was available to the dispatcher.  Based on this information, a
dispatcher radioed information to police officers, leading to the stop of Debra's minivan.

When a call taker enters data, an Incident History Detail is initiated with specific times
listed for certain actions.  The computer generates the time record when the person entering the
information hits enter at the terminal.  (Peddycourt dep., pp. 46, 56.)  The Incident History Detail
for the Mall incident shows that Mr. Peddycourt entered his first report at 17:42:20, listed the
incident type as "Robber Robbery," and assigned it a Priority 1 which indicates that it just
occurred or that it is a serious incident or both.  (Peddycourt dep., pp. 46-47.)  Besides showing
what information Mr. Peddycourt entered at the console, the Incident History Detail indicates the
times at which a dispatcher communicated with police officers.  (Peddycourt dep., pp. 23-24.)  It
may show some of the content or purpose of the transmissions but it does not indicate the precise

6

content of those transmissions.  (Peddycourt dep., pp. 55, 23-24.)  For example, at 17:46:55, the Incident History Detail indicates that an officer (Defendant Leibach, indicated by his number 726) radioed the dispatcher that he was at East Washington Street and North Ash Street with the suspect vehicle.  (Peddycourt dep., p. 55; Incident History Detail for 17:46:55.)  Plaintiffs have not suggested that the Incident History Detail is an inaccurate reflection of the chronology of events.

The Incident History Detail provides the following information.  Mr. Peddycourt entered the first record at 17:42:20.  The dispatcher put an officer (Defendant Baltzell, badge number 712) on the ticket at 17:42:26.  (Peddycourt dep., pp. 21-22.)  During the next few minutes, a number of other officers reported to dispatch.  At 17:43:26, the dispatcher reported an ID from Defendants Beck and Smith and Officer Schaffe Smith.  At 17:43:56, the dispatcher transmitted information regarding the license plate number RASHAD8, Debra Williams' name and address, and a description of the vehicle.  At 17:46:55, Defendant Leibach reported that he was at East Washington Street and North Ash Street with the suspect vehicle.  At 17:47:02, Defendant Shaffer (903) reported that he was at East Washington Street and North Ash Street.  At 17:48:27, Defendant Myers (905) reported that he was at Washington and Ash and that three subjects had been detained.

At 17:54:48, the dispatcher reported that Officer Baltzell (712) was with a victim at the Mall.  At 17:56:21, the dispatcher reported that Officer Mitchell (717) was at the Mall.  At 18:07:39, the dispatcher reported that Baltzell (712) was en route to East Washington and North Ash Streets with the victim for a showup.  (Baltzell dep., p. 58.)  At 18:07:51, the dispatcher reported that Mitchell was en route to East Washington and North Ash Streets with a victim for the showup.  At 18:13:18, the dispatcher reported a communication from Mitchell that the showup was negative.

At 18:14:19 and 18:15:04, the dispatcher reported that Baltzell and Mitchell had left the scene to take the victims to the police station for interviews and to wait for their parents.

(Mitchell dep., pp. 15-17.)  At 18:16:39, 18:21:27, 18:21:43, and 18:27:56, the dispatcher reported that Wilberg (799), Shaffer (903), Leibach (726), and Myers (905), respectively, had left the scene and were back in service.  (See Baltzell dep., pp. 58-59, explaining procedure regarding officers calling in when they have left the scene.)  At 18:28:05, the dispatcher reported that Smith (782) had left the scene and was back in service; Beck was with him.  At 18:38:16 and 18:48:33, the dispatcher reported that Baltzell (712) and Mitchell (717) were back in service. At 18:48:33, the dispatcher closed the incident history.

### 3.  The Stop

Defendant Leibach testified that he was the first officer to arrive at the Williams' home. He testified that he remembered the dispatcher transmitting information regarding "a robbery call, and the suspect reportedly left in a dark colored minivan with a license Rashad 8 . . . ." (Leibach dep., p. 10.)  Leibach specifically recalled the dispatcher using the word "robbery," and stating that the suspect was a black male and the license plate returned to 505 North Ash. (Leibach dep., pp. 10-13, see also Baltzell dep., pp. 28-29.)  He acknowledged that the Incident History Detail showed that the call taker provided additional information to METCAD, but he did not recall the dispatcher transmitting any other details.  He stopped Debra's van at about 17:46.

### 4.  Debra

Around this time, several other officers arrived at the scene.  Debra leaned her head out of the minivan and asked what was going on.  Officer Leibach and several other responding officers drew their weapons and Leibach ordered Debra to get out of the van.  Debra stuck her head out of the van window and yelled, "What is going on?"  (Debra dep., p. 21.)  Leibach ordered her to put her head inside the van or he would shoot her.  Leibach then escorted her to a police car.  (Debra dep., p.24.)  During this time, several officers had their guns drawn and pointed at Debra.  An officer ordered her to get out of the van, put her hands up, and walk backward to a police car.  (Debra dep., pp. 23-24.)  Debra walked forward because she was

confused.  (Debra dep., p. 24.)  She repeatedly asked what was going on.  (Debra dep., pp. 24-25.)

Debra testified that she felt very upset, scared, and traumatized as she walked from the van to the police car.  Rashad testified that Debra started to cry when she got out of the van and saw all the guns.  (Rashad dep., p. 41.)  When she got into the police car, she told Officer Liebach that she was having trouble breathing and asked him not to close the door.  (Debra dep., p. 25.)  He told her he would open the window but she had to get in.  (Debra dep., pp. 25, 101.)  The officer then asked her some questions about who was in the van.  (Debra dep., p. 101; Leibach dep., pp. 28-29.)  While Debra was in the police car, she made three cell phone calls, to her sister Cora and her brothers Craig and Al.  (Debra dep., p. 64.)  She also talked to her husband, who was standing on the sidewalk (Debra dep., p. 113, "I kept hollering out to him and talking to him and trying to ask him, see what was going on.")

Officer Leibach let Debra out of the police car immediately after the showup which occurred at 18:13.[1]  (Leibach dep., p. 29.)  Debra was detained for a maximum of twenty-five minutes, from approximately 17:50[2] until about 18:15.

---

[1]Witnesses have different recollections as to when Debra was released from the police car.  For example, Herman testified that Debra was in the police car for five to ten minutes.  (Herman dep., p. 37.)  Anthony Craig Williams testified that Debra was released from the police car and he called 911 "way before the showup ended."  (Anthony Craig Williams dep., p. 23.)  Liebach testified that he released Debra from the police car immediately after the showup which was over by 18:13.  (Liebach dep., pp. 29-30 "[after the showup, she was detained for the] amount of time it took me to walk to my car and open the door.")  He left the scene at 18:21.  Asuming that it took Leibach two minutes to walk to the car and open the door, Debra was detained for a total of twenty-five minutes.

The Court concludes that the version that has Debra in the police car until after the showup is the one that most favors Plaintiffs.

[2]The Court assumes that the detention began at approximately 17:50 based on Officer Myers' report that all three occupants of the minivan were detained by 17:50:27, the time he reported to dispatch.  (See Incident History Detail.)

9

At the time Leibach let her out of the car, he observed that she was still upset.  (Leibach dep., p. 30.)  He testified that he was not aware that she was having chest pains and did not observe that she had any other condition that warranted an ambulance being brought to the scene.  (Leibach dep., p. 31.)  Debra testified that when she got out of the police car, she was still very upset, she was having trouble breathing, she was shaking, and her head and chest were hurting.  (Debra dep., p. 112-13.)  Although she was feeling badly, she testified that she never asked any officers to call 911 or get an ambulance for her.  (Debra dep., pp. 35, 110.)  An officer helped her out of the police car and helped her sit down on the ground.  (Herman dep., p. 38.)  Herman, Cissilla (her sister), and Craig (her brother) were standing around her.  (Debra dep., p. 113.)  They all observed that Debra was upset and agitated, and was complaining of feeling poorly, difficulty breathing, dizziness, and chest and head pain.  (Herman dep., p. 38, stating that Debra was complaining that her chest hurt and she couldn't breathe; Anthony Craig Williams dep., pp. 20-21, stating that Debra was crying and shaking and acting like she was about to faint; Cisscilla Brown dep., p. 13, stating that Debra was upset, crying, and shaking.)  Herman asked an officer to call an ambulance.  (Herman dep., pp. 37-38.)  The officer or officers said no.  Then Craig asked an officer or officers to call an ambulance.  The officer or officers continued to say no, or "right now, I can't" but did not explain why.  (Anthony Craig Williams dep., p. 28.)  At that point, Craig called 911 and requested an ambulance.

The ambulance arrived sometime before 6:29, because the EMTs recorded her pulse at that time.  (Pool dep., p. 9.)  Debra's heart rate at that time was 112; Dr. Poole testified that anything less than 100 would be a normal pulse for a healthy 37-year-old woman with Debra's physical characteristics.  (Pool dep., p. 9.)  The ambulance transported Debra to the hospital.  Debra arrived at the emergency room at 6:47 p.m. where she complained to Dr. Stephen Pool of chest pain and shortness of breath.  (Pool dep., p. 6.)  Dr. Pool's examination indicated increased heart rate, increased respiratory rate, and normal blood pressure.  Dr. Pool diagnosed Debra with anxiety.  He released her without restrictions at 8:30 p.m. that evening.  When he discharged her, her vital signs had returned to within normal limits.  Her pulse rate had dropped to 98 and she was no longer experiencing any pain.

10

### 5. Herman

Herman came out of his house while Debra, Rashad, and Anthony were still in the minivan.  He testified as follows:

> [After Rashad called me], I immediately put on my shoes and stuff and come outside with the cordless phone in my hand . . . .  I come out our side door into the driveway, and started walking down towards the van.  I see all the officers out of they car with the guns out.

> So I immediately start saying, this is my wife and my son and my nephew in this van.  What is the problem?  What is going on?  I know they haven't done anything.  And as I was approaching the van, Sergeant Shaffer was the one that was coming up toward me with his gun out, saying sir, you need to step back or we shoot.  So, I said shoot for what?  I said first of all, let me let you know this is a cordless phone that I have in my hand so you wouldn't accidentally shoot me thinking that this is a gun.  So I tell them again, I said well, sir, this is my wife and my son in this van, they just coming from Marketplace Mall.  Why are you guys out here with your guns and stuff out on my wife and my son and my nephew?  So he said well, we investigating.  Never did tell me exactly what was going on.  But he said you need to step back.  So I said okay.  Fine.  That's fine.

> So I stepped back a little bit.

(Herman dep., pp. 6-7.)  He also stated that the officers had the guns out during the time it took them to get all of the passengers out of the van and into the police cars.  (Herman dep., pp. 16-17.)

### 6. Rashad

During January 2004, Defendant Beck was patrolling with Officer Shaffe Smith.  On January 18, 2004, both officers were working at the police station when they heard a dispatch relating to an incident at Marketplace Mall.  They immediately proceeded to the Washington

11

Avenue address.  When they arrived, Leibach and Shaffer were already there.[3]  Beck drew his

weapon because he was "responding to . . . a felony traffic stop."  (Beck dep., p. 29.)

Debra got out of the van first, and Leibach escorted her to a police car.  Beck was

responsible for securing Rashad in a separate police car.  According to Rashad, the police

ordered him to get out of the minivan and walk backward toward a police car with his hands in

the air.  While he was walking backwards, his pants started falling down and he began to reach

for them.  An officer told him to keep his hands up or the officer would shoot him.  (Herman

dep., pp. 13, 35.)  Rashad complied with the orders to walk backward, to keep his hands in the

air, and to get into the police car.  When he was told not to reach for his pants, he complied with

that order as well.

At the police car, Rashad was handcuffed with his hands behind his back.  He was locked

into a police car with Officers Beck and Smith.  While they waited for the victims to arrive for

identification, the officers questioned him.

After Rashad was secure, another officer escorted Anthony to a police car.  After

Anthony had exited the van, Officer Aschenbrenner and Sergeant Shaffer still had their guns

pointing at the van until they had checked it for additional occupants and weapons.

(Aschenbrenner supplemental report, p. 2.)  The Incident History Detail indicates that all three

occupants of the minivan were detained in separate vehicles by 17:50:27.  Plaintiffs all testified

that they did not see any guns after Debra, Rashad, and Anthony were secured in police cars.

(Rashad dep., p. 31, Debra dep., p. 134, Herman dep., p. 16.)

---

[3]The testimony is inconsistent here:  Beck first testified that he was on the scene at
17:43:26, the time that Officer Schaffe Smith (Beck's patrol partner) first identified himself on
the radio.  However, it appears undisputed that Beck arrived at the scene after Leibach, who first
identified himself to dispatch at 17:45:08, and then reported to dispatch that he was on the scene
with the suspect vehicle at 17:46:55.  The time Beck arrived at the scene is not a material issue
however.

### 7.  The Showup

While other officers placed Debra, Rashad, and Anthony in police cars, Defendants Baltzell and Mitchell were driving to Marketplace Mall to talk to the victims.  They arrived at the Mall at around 17:54 and 17:56, respectively.  Baltzell interviewed Nathan Rewerts and Mitchell interviewed Corey White.  At some point during the interview, Baltzell learned that no weapons had been involved in the mall incident, and he phoned his supervisor, Sergeant Myers, to let him know that.  Sergeant Myers apparently did not communicate this information to Officer Beck, who was handling Rashad's detention.  By 18:07, Baltzell and Mitchell were en route to the scene with the victims.  They arrived at 18:12.

Rashad testified that he was held in the police car waiting for the victims to showup for about an hour.  (Rashad dep., p. 25.)  The Incident History Detail shows that he was detained beginning about 17:50 and the victims arrived at about 18:12.  Rashad's subjective sense that an hour had passed while he was waiting does not provide evidence that refutes the objective evidence provided by the computer-generated chronology provided in the Incident History Detail.  Rashad was detained for twenty-two minutes before the showup.

When the victims arrived, the officers let Anthony and Rashad out of the police cars so the victims could look at them.  This took a few minutes.  (Rashad dep., p. 26.)  By 18:13:18, Mitchell had reported to dispatch that the showups were negative, that is, the victims did not identify Rashad or Anthony as the suspect.  After the showup, Wilberg released Anthony and had left the scene by 18:16:39, as indicated by the "inservice" notation on the Incident History Detail.  (Wilberg dep., p. 53.)  Rashad was put back in the police car, still in handcuffs.  While Beck filled out a juvenile contact form (Beck dep., pp. 44-45), Officer Smith questioned him about issues unrelated to the Mall incident (Rashad dep., p. 28).

Beck removed Rashad's handcuffs when he released Rashad to his father.  (Beck dep., p. 45.)  This occurred between 6:22 (the time listed on the juvenile contact form, which Herman signed) and 6:28, when Beck left the scene.  (Beck dep., p. 44; Incident History Detail.)  Rashad

testified that he was detained for about thirty minutes after the showup.  (Rashad dep., p. 27.)

Herman testified that Rashad and Anthony were detained after the showup for about fifteen to

twenty minutes.  (Herman dep., p. 20.)  Anthony Craig Williams also testified that Rashad was

released about twenty minutes after the showup.  (Anthony Craig Williams dep., p. 20.)  The

inservice notation on the Incident History Detail shows that Officers Smith and Beck left the

scene at 18:28:05.  Plaintiffs' subjective impressions regarding the length of time Rashad was

detained in the police car are not sufficient to raise a dispute as to objective evidence presented

by an independent, computer-generated time record.  Thus, the evidence shows that, after the

negative showup, Rashad was detained in the police car from 17:13 until 18:28 at the very latest

– a maximum of fifteen minutes.

Altogether, Rashad was detained for a total of about thirty-seven minutes; twenty-two

minutes before the showup and fifteen minutes after the showup.

### B.  Plaintiffs' Claims

The Court must first determine what claims Plaintiffs are raising.  Based on the summary

judgment motion and Plaintiff's response, the Court concludes that Plaintiffs' claims against

Defendant officers include the following:  (1) unreasonable seizure as to Debra and Rashad;

(2) excessive force as to Herman, Debra, and Rashad; (3) violation of the right to equal

protection as to Herman, Debra, and Rashad; (4) false arrest/imprisonment as to Debra and

Rashad; (5) willful and wanton denial of medical treatment as to Debra; and (6) intentional

infliction of emotional distress (hereinafter "IIED") as to Herman, Debra, and Rashad.

Plaintiffs' claims against the City include (1) liability for all constitutional claims and state law

claims; and (2) failure to train its police officers regarding the appropriate use of force.

### III.  Analysis

Defendants argue that the Court should grant summary judgment in favor of Defendant

officers because the evidence does not support Plaintiffs' claims, therefore Plaintiffs cannot

establish a number of elements of the claims; the police officers had reasonable suspicion to stop

the van and probable cause to arrest; and no constitutional violations occurred as a result of the officers' conduct.  Alternatively, Defendants contend that Defendant officers are protected by qualified immunity.  As to Defendant City, Defendants argue that because the officers did not violate any of Plaintiffs' constitutional rights, the City cannot be held liable.

Plaintiffs argue that the Court should deny the motion for summary judgment because "there are disputed issues of material fact that preclude summary judgment as to the stop of Debra Williams and Rashad Williams; arrest of Debra and Rashad; excessive use of force as to Debra, Rashad, and Herman; initial detention of Debra and Rashad; continued detention of Debra and Rashad; use of handcuffs on Rashad; refusal to call for medical services for Debra; disparate racial treatment of Debra, Rashad and Herman; and the City's sanctioning of the use of excessive force and failure to train it's [(*sic*)] officers as to excessive use of force."  (#63, p. 52.)

### A.  Constitutional Claims

Section 1983 (42 U.S.C. § 1983) "is not itself a font for substantive rights; instead it acts as an instrument for vindicating federal rights conferred elsewhere."  *Spiegel v. Rabinovitz,* 121 F.3d 251, 254 (7th Cir. 1997).  "The standards for a successful Section 1983 action against local police officers or a municipality are well known."  *Ienco v. City of Chi.,* 286 F.3d 994, 997 (7th Cir. 2002).  In the first step, the plaintiff must demonstrate that he or she has been deprived of a federal constitutional right.  *Id.* at 997-98.  In the second step, the plaintiff must show that the constitutional deprivation was caused by persons acting under color of state law.  *Id.* at 998.  To maintain an action against a municipality, the plaintiff must demonstrate that the constitutional injury was caused by an express municipal policy, a widespread custom, or the act of a decision maker with final policymaking authority, and that the policy was the proximate cause of the plaintiff's constitutional injury.  *Id.* (citing *Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-91 (1978)).  In this case, the parties do not dispute that the officers were acting under color of state law.

15

For the reasons stated below, the Court concludes that Plaintiffs have not shown that a genuine issue of material fact exists as to the constitutional claims that is sufficient to defeat summary judgment on the constitutional claims. Thus, Plaintiffs have failed to establish that Defendants violated their constitutional rights.

### 1. The Seizure

The Court first addresses the issue of whether the seizure of Debra and Rashad violated their Fourth Amendment rights. A Fourth Amendment seizure occurs when a police officer's actions restrain a person's freedom to walk away from the encounter. *United States v. Mancillas,* 183 F.3d 682, 695 (7th Cir. 1999) (quoting *Terry v. Ohio,* 392 U.S. 1, 16 (1968)). There are two categories of such seizures: brief investigatory stops, known as *Terry* stops; and full custodial arrests. *Id.*; *Smith v. Ball State Univ.*, 295 F.3d 763, 768 (7th Cir. 2002) (discussing the differences between a *Terry* stop and a formal arrest). In this case, it is undisputed that Debra and Rashad were seized. The parties disagree as to whether the seizures were *Terry* stops or full custodial arrests, and regardless of the classification, whether the seizures were reasonable under the circumstances.

A *Terry* stop is permissible when an officer can point to articulable facts demonstrating a reasonable suspicion that crime is afoot. *Mancillas,* 183 F.3d at 695; *compare United States v. Packer,* 15 F.3d 654, 656-59 (7th Cir. 1994) (holding that the facts within police officers' knowledge were insufficient to support a reasonable suspicion that crime was afoot). *Terry* is based on safety concerns for police officers and the public. *United States v. Mitchell,* 256 F.3d 734, 737-38 (7th Cir. 2001). If an officer is justified in believing that a person may be armed or potentially violent, the officer can take the measures necessary to determine if the person has a weapon and to neutralize the threat of harm. *Id.* If there are sufficient facts to support a *Terry* stop, the length of the stop and the manner in which it is carried out must be reasonable, so that the detention lasts no longer than necessary and the officers use the least intrusive means reasonably available to effectuate the purpose of the stop. *Florida v. Royer,* 460 U.S. 491, 500 (1983).

On the other hand, a full custodial arrest must be supported by probable cause, which is a higher standard than the reasonable suspicion that will justify a *Terry* stop.  *Ray v. Vill. of Woodridge,* 221 F. Supp. 2d 906, 912 (N.D. Ill. 2002) (citing *Ball St. Univ.,* 295 F.3d at 768). There is no precise test to determine probable cause.  *United States v. McClinton,* 135 F.3d 1178, 1183 (7th Cir. 1998).  Probable cause depends on the totality of the facts and circumstances at hand and exists when an officer has reasonably trustworthy information sufficient to justify a prudent person to believe that a suspect has committed, is committing, or is about to commit an offense.  *United States v. Sawyer,* 224 F.3d 675, 678-79 (7th Cir. 2000).  "Probable cause, however, does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime."  *Id.* at 679. Probable cause is less than a more-likely-than-not test, "but how much less depends on the circumstances" (*Gramenos v. Jewel Cos., Inc.*, 797 F.2d 432, 438 (7th Cir. 1986)), including the "factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act" (*Brinegar v. United States,* 338 U.S. 160, 175 (1949)).

There is no bright line dividing *Terry* stops from full blown arrests; instead, the Court must evaluate the totality of circumstances in each case.  *Ball State Univ.*, 295 F.3d at 768. Depending on the facts, a seizure involving events such as an officer's display of weapons, use of handcuffs, and use of force may or may not constitute a full custodial arrest.  *United States v. Vega,* 72 F.3d 507, 515 (7th Cir. 1995).  Moreover, the seizure that qualifies as a full arrest in one situation may be only a *Terry* stop under a different set of circumstances.  *Vega,* 72 F.3d at 515 ("In fact, 'stops too intrusive to be justified by suspicion under *Terry,* but short of custodial arrest, are reasonable when the degree of suspicion is adequate in light of the degree and the duration of the restraint.'") (quoting *United States v. James,* 40 F.3d 850, 875 (7th Cir. 1994), *modified on other grounds*, 79 F.3d 553 (7th Cir. 1996)).  Furthermore, what begins as a *Terry* stop may evolve into a full arrest as the length of detention increases or the manner of detention changes.  *See e.g.*, *Ball State Univ.,* 295 F.3d at 769.  If so, the arrest must be supported by probable cause, which can develop during the course of a *Terry* stop.  *Id*.

17

In this case, notwithstanding the display of force, use of weapons, and use of handcuffs, neither Debra nor Rashad were subject to a full custodial arrest. As noted above, *Terry* permits officers to take the measures necessary to ensure the public safety and to neutralize potential violence. *Mitchell,* 256 F.3d at 738 (quoting *Terry,* 392 U.S. at 24); *United States v. Tilmon,* 19 F.3d 1221, 1226 (7th Cir. 1994) (stating that the "mere use or display of force in making a stop does not necessarily transform a stop into an arrest if the surrounding circumstances give rise to a justifiable fear for personal safety"). The officers were confronted with a situation that was potentially dangerous. Based on what they knew at the time, the officers reasonably could have believed that one of the occupants of the van was the robbery suspect. The officers did not know whether weapons were involved in the incident or whether the vehicle contained weapons. They were following up on a very recent dispatch report and the vehicle stop occurred within minutes after the first dispatch about the robbery. For these reasons, the Court concludes that the officers' detention of Debra and Rashad constituted an investigative (*Terry*) stop and did not rise to the level of an arrest or become an arrest during the course of detention.

## 2. The Reasonableness of the Seizure

The record also shows that the manner in which the officers detained Debra and Rashad was not unreasonable. *See Mancillas,* 183 F.3d at 695 (the Fourth Amendment does not prohibit *Terry* stops that are reasonable in their duration and in the manner in which they are carried out). The Seventh Circuit has adopted a two-part inquiry for determining the reasonableness of an investigatory detention: (1) did police have specific, articulable facts giving rise to reasonable suspicion, and (2) was the degree of intrusion reasonably related to the facts then known to the officers. *Tilmon*, 19 F.3d at 1224.

With respect to this case and the requirement for specific and articulable facts, we must assess the totality of the circumstances and the reasonable inferences that may be drawn from it. Here, the dispatcher described the vehicle in which the suspect left the Mall as a van with license plate RASHAD8. That description exactly matched the vehicle that Debra was driving and in which Rashad and Anthony were passengers. The officers were following up on this dispatch

report.  Based on this information, the Court concludes that the officers had reasonable suspicion to believe that the occupants of the van had been involved in criminal activity and to stop the van for further investigation.  Moreover, the vehicle stop occurred within minutes after the first radio communication about the robbery.  Courts have found reasonable suspicion in cases involving greater temporal and geographic gaps.  *See e.g., Tilmon*, 19 F.3d at 1225 (two hours after robbery, a car was stopped fifty miles away from the robbery, but "these temporal and geographic gaps were not enough to dispel the reasonable suspicion based on the exact match of a unique automobile with a driver fitting the general description of the bank robber"); *United States v. Longmire*, 761 F.2d 411, 419-20 (7th Cir. 1985) (four hours after receiving radio dispatch closely matching description of car under surveillance, automobile was stopped and searched for weapons, and reasonable suspicion was not dispelled by fact that dispatch indicated northing more than the race of the two black females, and did not indicate that the women were armed).

Plaintiffs contend that the stop was unreasonable because no officer tried to confirm the facts of the robbery before the stop.  The Seventh Circuit has stated that a police officer may not close his eyes to facts that would help clarify the circumstances of an arrest.  *Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006, 1016 (7th Cir. 1986).  Officers must pursue "[r]easonable avenues of investigation" before making an arrest.  *Id.*  Plaintiffs contend that the officers closed their eyes to facts that would help clarify the circumstances of the Mall incident here, including the facts that Debra, Rashad, and Anthony did not look like a black male in his twenties or thirties or like a a older black man with bad teeth; the officers did not inquire as to whether the suspect used any guns, weapons, or force in the Mall incident; and the officers did not try to speak to the alleged victims or the person who reported the license plate number.  Here, however, only approximately four minutes elapsed between the time the first radio report was broadcast and the time Officer Leibach stopped the van, therefore, the officers' failure to obtain more information was not unreasonable.  Furthermore, it is undisputed that, as some of the officers were performing the stop, other officers were on their way to the Mall to interview the victims and bring them to the scene, thus performing some of  the investigation that Plaintiffs

19

claim was lacking.  The fact that the officers did not perform additional investigation *before* making the stop does not make the seizure unreasonable, particularly in light of the fact that the officers could have reasonably brought the van's occupants to the police station for a formal lineup.

Finally, Plaintiffs' contention that the officers were not relying on a "reasonably credible witness" is not persuasive.  Here, the officers were relying on the report from the dispatcher.  The Seventh Circuit has held that police officers are entitled to rely on reasonable information relayed to them from a police dispatcher.  *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001).

Besides the reasonableness of the initial stop, Plaintiffs also contend that there are disputed material facts as to whether the detention of Debra in the police car after the officers realized she did not fit the description of the panhandler was unreasonable, whether Rashad's detention was unreasonable once the officers realized that he did not fit the description of the panhandler, whether it was unreasonable to handcuff Rashad in the back of police car, whether it was unreasonable to detain Rashad after the showup, and whether it was unreasonable to question Rashad about issues unrelated to the investigation.

However, when it comes to raising a factual issue, Plaintiffs mention only that the duration of Debra's detention was disputed.  To the extent that the facts were inconsistent, the Court concluded that Officer Leibach's testimony that he detained Debra until after the showup was more favorable to Plaintiffs' case than Craig Williams' testimony that she was released "way before the showup" (Craig Williams dep., p. 23), or Herman's testimony that she was released after five to ten minutes.  Construing the evidence in favor of Plaintiffs, Debra was detained in the police car for at most twenty-five minutes and released immediately after the showup.  The evidence also shows that Rashad was handcuffed and detained in a separate police car for about twenty-two minutes before the negative showup and about fifteen minutes after the showup and that he was released at or before 18:28 when Officer Beck left the scene.

20

Plaintiffs repeat that Debra, Rashad, and Anthony did not match the description of a black male in his twenties or thirties or a black male with bad teeth and that this made their detention unreasonable once the officers got a look at each of them.  The Court notes that the dispatcher had reported that the suspect was in a van with the license plate RASHAD8.  Debra was driving a van with that precise license plate.  Thus, based on what the officers knew at the time, she may have been involved as an accessory to robbery and it was not unreasonable for the officers to detain her pending further investigation.  The same reasoning applies to Rashad and Anthony.  They were, at the least, passengers in a van that reportedly contained a person suspected of being involved in a robbery.  Their presence in a van that had reportedly been involved in criminal activity warranted further investigation for that reason, regardless of the fact that they may not have resembled the suspect.

Plaintiffs also repeatedly state that the officers never explained why they were stopped and questioned or what was the purpose of the officers' actions.  Plaintiffs do not explain what relevance this has to the constitutional or state law claims raised in this case.

Plaintiffs raise other issues regarding Rashad's detention.  The evidence shows that Rashad was handcuffed and kept in the police car from 17:50 until the victims arrived at the scene, around 18:12.  He got out of the car so that the victims could see him.  When the victims reported that he was not the suspect, he was returned to the police car in handcuffs and held another fifteen minutes after the showup.  During that time, one of the officers questioned him about unrelated issues and the other officer completed some paperwork.  Plaintiffs contend that the seizure was unreasonable because Rashad was handcuffed, he was detained in handcuffs for fifteen minutes after the showup ended, and an officer questioned him about issues unrelated to the Mall incident.

Specifically addressing the handcuff issue, Plaintiffs contend that, based on Ninth Circuit case law, when police have only reasonable suspicion to make an investigatory stop, drawing weapons and using handcuffs will violate the Fourth Amendment.  See *United States v. Del Vizo*,

918 F.2d 821, 825 (9th Cir. 1990); *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996); *Robinson v. Solano County*, 278 F.3d 1007, 1015 (9th Cir. 2002). Here, according to Plaintiffs, "there was no investigation of a serious crime like a gang-related drive-by shooting" (#63, p. 61) and no weapons or violence were involved. Furthermore, none of the occupants in the van had been involved with the police before, none were suspected of being armed or dangerous, and no warrant had been issued establishing probable cause.

However, the Seventh Circuit court has stated that, "[f]or better or for worse, the [expansion of *Terry*] has led to the permitting [in *Terry* stops] of the use of handcuffs, the placing of suspects in police cruisers, the drawing of weapons and other measures of force more traditionally associated with arrest than with investigatory detention." *Tilmon*, 19 F.3d at 1224-25. As noted above, *Terry* is based on safety concerns for police officers and the public. *Mitchell,* 256 F.3d at 737-38. If an officer is justified in believing that a person may be armed or potentially violent, the officer can take the measures necessary to determine if the person has a weapon and to neutralize the threat of harm. *Id.* Although this was not a gang-related drive-by shooting, the reported crime was a robbery, which is a felony and a serious crime that can involve weapons. Furthermore, although Rashad was young, he was six feet tall. The physical stature of a suspect is a permissible consideration during an investigative stop. *Graham v. Connor*, 490 U.S. 389, 396 (1989). Finally, Plaintiffs are correct that the Mall incident involved no weapons, but Defendant officers did not have that information at the time they stopped the van. Moreover, at the time the officers stopped the van, they did not know who was in it, whether they had been involved with the police, whether they were armed and dangerous or the subject of a warrant, or whether the van contained weapons. The Court can only consider what the officers knew when they made the stop.

Plaintiffs also state many times that the information listed in the Incident Detail History at 17:44:37 ("susp was trying to get money from people, asked the 2 vics to help him push his van into a spot, they did and he grabbed $5 from them") does not constitute a robbery on its face. Similarly, Plaintiffs state that the panhandling incident did not constitute a forcible felony.

22

While these statements may be true, the fact that the Mall incident did not constitute a forcible robbery or that the text of the 17:44 dispatch did not describe a robbery is based on the twenty-twenty perspective of hindsight. The information in the Incident History Detail listed at 17:44 is information that the call taker entered into the terminal. Although it is undisputed that this information was available to the dispatcher, the officers all testified that the dispatcher had not transmitted all details of the Mall incident to the officers at the time of the stop. Similarly, it appears undisputed that the panhandling incident did not involve weapons and did not, in fact, involve any of the occupants of Debra's van. However, the details of the Mall panhandling incident are not relevant to the Court's consideration of whether Defendants violated Plaintiffs' constitutional rights. The Court can only consider Defendants' conduct in light of what they knew at the time they made the vehicle stop. Based on the information the officers knew at the time, the use of handcuffs was not unreasonable.

Plaintiffs also apparently contend that Rashad's detention was unreasonable because an officer questioned him after the showup about unrelated activities. Questioning that prolongs the detention, yet cannot be justified by the purpose of an investigatory stop, is unreasonable under the Fourth Amendment. *United States v. Childs*, 277 F.3d 947, 952 (7th Cir. 2002) (*en banc*). However, "[q]uestions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention." *Id*. at 954. Here, the evidence shows that after the showup, Officer Smith questioned Rashad while Officer Beck completed the juvenile contact card. When the contact card was complete, Officer Beck released Rashad to his father and the two officers left the scene. Plaintiffs have not presented any evidence that raises a dispute with regard to whether the questioning lasted any longer than the time it took to complete the card. The Court concludes that the questioning did not impermissibly prolong the detention or change the fundamental nature of the stop. *See People v. Gonzalez,* 789 N.E.2d 260, 270 (Ill. 2003) (holding that delaying a routine traffic stop to perform a canine search for drugs in the absence of specific and articulable facts to support the drug search impermissibly broadened the scope of the initial stop because it prolonged the stop and

changed the nature of the stop to a drug investigation), *abrogated on other grounds*, *People v. Luedemann*, 857 N.E.2d 187 (Ill. 2006).

In assessing whether a detention is too long in duration to be justified as an investigative stop, courts can consider whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.  *United States v. Sharpe*, 470 U.S. 675, 686 (1985).  A court making this assessment should carefully consider whether the police are acting in a swiftly developing situation, and in such cases, the court should not indulge in unrealistic second-guessing.  *Id.*  "A creative judge engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished.  But 'the fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, itself, render the search unreasonable.'"  *Id.* at 686-87 (quoting *Cady v. Dombrowski*, 413 U.S. 433, 447 (1973)).  The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it.  *Id.* at 687.

After carefully examining the facts surrounding the detentions, the Court concludes the officers' detention of Rashad and Debra was conducted in a reasonable manner.  The record demonstrates that the officers took measured steps to control what was, as far as the officers knew, a potentially dangerous situation.  The officers secured the situation, including handcuffing Rashad and Anthony, and quickly brought the victims to the scene for an identification.  After the showup, Officer Leibach immediately released Debra, and within fifteen minutes, Officer Beck released Rashad.  In light of the potential seriousness of the situation that the officers faced, and the steps they took, the Court finds that both the length of the detention and the manner in which it occurred was reasonable.  Therefore, the officers' detention of Rashad and Debra did not violate their Fourth Amendment rights to be free from unreasonable seizure.

### 3. Excess Force

Plaintiffs also claim that Defendants used excess force when they drew their guns and pointed them at Debra, Rashad, and Herman and threatened to shoot them and continued pointing the weapons after Debra, Rashad, and Anthony were secured in the police cars.

"[T]he right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to enforce it." *Graham*, 490 U.S. at 397. Courts evaluate allegations of excessive force using an "objective reasonableness" standard, in light of the facts and circumstances confronting the police officers at the time. *Id.* This fact-specific analysis requires the Court to consider the totality of the circumstances surrounding the incident. These circumstances include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether the suspect is actively resisting arrest or attempting to evade arrest. *Id.* Furthermore, we must consider the reasonableness of the officers' actions "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* Ultimately, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed--to the community or to the arresting officers--if left unattended." *Jacobs v. City of Chi.*, 215 F.3d 758, 773 (7th Cir. 2000) (quoting *McDonald v. Haskins*, 966 F.2d 292, 294 (7th Cir. 1992)).

As an initial matter, an officer's pointing a gun at a person during a valid stop is not unreasonable *per se*. *Wilkins v. May*, 872 F.2d 189, 194 (7th Cir. 1989). Here, the purported crime at issue, as far as the officers knew, was a robbery. Moreover, in direct contradiction to Plaintiffs' argument (*see* #63, p. 61), the officers did not know if weapons were involved in the Mall incident, nor did they know whether the van contained weapons.

Plaintiffs contend that the officers used excess force by pointing weapons at Plaintiffs, and by threatening to shoot. In *Jacobs*, the Seventh Circuit stated in *dictum* that the act of pointing a loaded weapon at a person under the circumstances in that case carried with it the

"implicit threat that the officer will use that weapon if the person at whom it is directed does not comply with the officer's wishes." *Jacobs*, 215 F.3d at 774 n.7.  In that case, the officer entered the apartment without any probable cause to suspect that Jacobs had committed any crime or that any criminal activity was being conducted in his apartment.  Furthermore, the officer kept his gun pointed at Jacobs for over ten minutes, "even after ascertaining that Jacobs was not the person he was looking for, and during which time Jacobs did nothing more threatening than provide the officer with his identification and ask the officer for permission to sit down." *Id.* at 773.  Here, in contrast to the situation in *Jacobs*, the officers' conditional threats were made when Plaintiffs failed to cooperate with the officers' directions.

Plaintiffs contend that the threats and display of guns constituted excess force because Debra, Herman, and Rashad did not display any aggressive behavior or conduct themselves in any way that indicated a physical threat and they complied with the officers' orders.  They ignore the undisputed evidence that Debra stuck her head out the window instead of getting out when the officer told her to and her erratic behavior as she exited the minivan, including her waving her hands around, talking and yelling, walking forward instead of backward as directed by Officer Leibach, and her "belligerent" conduct (Herman dep., p. 8).  We now understand this behavior was a result of Debra's fear and confusion.  (Herman dep., p. 31.)  Similarly, Rashad's initial movement to keep his pants from falling down was, we now know, not inconsistent with his innocence.  And Herman was trying to find out what was going on when he approached the area that the officers were trying to secure.

Nevertheless, conduct innocent in the eyes of the untrained may carry entirely different messages to the experienced or trained observer.  The Court cannot view Plaintiffs' conduct with the knowledge that it now has, nor judge Defendants' behavior in light of all the information available today.  Although these acts may appear tame in hindsight, the situation was uncertain and potentially dangerous in the eyes of the officers at the time because they believed they might be dealing with a robbery suspect.  The threats were conditional and in furtherance of securing the scene rather than gratuitous.  As soon as Debra, Rashad, and Anthony were secured in police

cars and the van had been checked for weapons, the officers put their guns away.  Contrary to the contention in Plaintiffs' brief, there is no evidence that the officers continued to display weapons once the van was checked and secured.

Reviewing the situation through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training, we cannot say that Defendants acted unreasonably in being prepared for possible violence.  Here, the officers' limited use of their weapons was a reasonable precaution in the context of this investigatory stop.  Accordingly, the Court concludes that the officers' use of force did not violate the Fourth Amendment.

### 4.  The Equal Protection Claim

Defendants next argue that the evidence does not support a claim for racial discrimination.

Plaintiffs respond that there are disputed material facts as to whether the treatment of Debra, Rashad, and Herman constituted racial discrimination.  In support they cite additional undisputed facts, including the following:  (1) Plaintiffs' testimony that they believe they were victims of racial discrimination, (2) testimony by their expert witness Dennis Waller, a former police officer, that "if they were white people in that car, [they] probably wouldn't have been stopped" (Waller dep., p. 45), and (3) "Sergeant Shaffer's admission under oath that had the Plaintiffs been white, they would have been questioned and asked for a statement (and not arrested at gun point, detained in a police car, handcuffed, or interrogated about unrelated issues)" (#63, p. 77).  Plaintiffs' argument on this claim refers only to Sergeant Shaffer's testimony.  Plaintiffs "argument," in fact, does nothing more than ask a question about that testimony (#63, p. 77 ("How, then do Defendants explain Sergeant Shaffer's admission . . .").)  That is not enough to defeat summary judgment.

To establish a *prima facie* case of discrimination under the equal protection clause, a plaintiff is required to show that he is a member of a protected class, that he is otherwise

similarly situated to members of the unprotected class, and that he was treated differently from members of the unprotected class.  *Brown v. Budz*, 398 F.3d 904, 916 (7th Cir. 2005).

A person's subjective belief that he or she was subject to racial discrimination is not sufficient to create a genuine issue of material fact.  *McMillian v. Svetanoff,* 878 F.2d 186, 190 (7th Cir. 1989) (stating that the "subjective beliefs of the plaintiff . . . are insufficient to create a genuine issue of material fact" and affirming summary judgment in favor of defendant on a race discrimination claim).  The same is true of Mr. Waller's testimony; Mr. Waller's subjective opinions on this issue do not constitute "specific facts showing that there is a genuine issue of material fact for trial."  FED. R. CIV. P. 56(e).

Regarding Defendant Shaffer's statements, the testimony to which Plaintiffs refer is quoted in full and in context below:

> Mr. Kirchner:  What information, if any, justified their [(Rashad and Anthony)] detention at the time they were handcuffed and placed into a squad car?
> Sergeant Shaffer:  We were investigating a robbery.
> Q.  So they are potential witnesses?
> A.  I don't know if they are a suspect or not.
> Q.  Are you saying that the City of Champaign policies authorize the handcuffing and detention of persons when you have no basis to believe those persons to have been involved in a criminal offense?
> A.  Well, there is a basis.  The reported suspect is reported as black male and they are in the vehicle that was provided as leaving the scene.
> Q.  So their race in and of itself authorized their handcuffing and detention?
> Mr. Krchak:  Objection.  That is not what he is saying.
> Mr. Kirchner:  What other than their race authorized their detention and handcuffing?
> A.  They were in a vehicle leaving the scene of a reported robbery.
> Q.  So if they had been white instead of black, their detention would not have been authorized?
> A.  I am not sure what you are getting at here with the question.
> Q.  Well, I am trying to find out if your claim is that the reason these two boys were handcuffed and placed in the squad cars is because they are black and the report had been of a black perpetrator or if their mere presence in the vehicle is the basis on which you commanded their detention and handcuffing?
> A.  The suspect was reported to be a black male and they were a black male in a vehicle that was reported to be the suspect vehicle leaving the scene of a robbery.

28

Q.  So if they were white they would not have been detained?
A.  They would have been questioned in a statement.
Q.  But not handcuffed?
A.  It is possible.
Q.  And not placed into a police vehicle?
A.  That is possible.

(Shaffer dep., pp. 60-62.)  In context, Shaffer's testimony indicates that the only reason that race entered into the vehicle stop is because Rashad and Anthony matched the description of the suspect to the extent that they were both black males *and* they were in the vehicle that the suspect was reportedly in when he left the Mall.  Shaffer's testimony that white males would have been questioned but possibly not handcuffed or placed into a police car is based on the undisputed fact that the suspect in the Mall incident was described as a black male as opposed to a white male.  Plaintiffs' counsel's description of Sergeant Shaffer's testimony is misleading and borders on sanctionable conduct.

This case is before the Court on a summary judgment motion.  Plaintiffs are entitled to have factual inferences and disputed facts construed in their favor, but they also bear the burden of establishing the elements of their claims at this point.  *Anderson*, 477 U.S. at 250.  Here, Plaintiffs have failed to establish the elements of this claim or to present evidence to support the claim.  The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Id.* (stating that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  Accordingly, the Court grants Defendants' motion for summary judgment as to Plaintiffs' equal protection claims.

### B.  State Law Claims

### 1.  Unlawful Arrest/Imprisonment

Defendants also argue that Defendants had reasonable suspicion for the detention and alternatively, probable cause to arrest Plaintiffs, therefore they cannot be liable for false arrest or false imprisonment.

False imprisonment is an unreasonable restraint of a person's liberty against his will caused or procured by the defendant.  *Meerbrey v. Marshall Field & Co.*, 545 N.E.2d 952, 955 (Ill. App. Ct. 1989).  The Court has already concluded that the detention here was an investigatory stop and not an arrest, and the officers had reasonable suspicion to perform the investigatory stop.  Furthermore, the scope and duration of the seizure were reasonable.  Thus, although Defendant officers "restrained" the liberty of Debra and Rashad, under the facts of the case viewed in the light most favorable to Plaintiffs, the seizure did not constitute an "unreasonable" restraint of their liberty.  Accordingly, the Court grants summary judgment in favor of Defendants on Plaintiffs' claims of unlawful arrest/imprisonment.

### 2.  Denial of Medical Care Claim

Defendants next argue that the evidence does not support Debra's claim that she was denied medical treatment.  They contend that the record shows that (1) Debra never asked the officers to call an ambulance on her behalf; (2) even if the officers denied Craig Williams' request or Herman's request for an ambulance, Craig Williams immediately called 911 and an ambulance arrived shortly thereafter; and (3) the record contains no evidence that Debra needed immediate medical treatment or that any delay in her arrival time at the hospital affected her physical or mental condition.

As an initial matter, Plaintiffs' response indicates that Debra is asserting a state law claim for willful and wanton denial of medical treatment rather than a federal constitutional claim that Defendants acted with deliberate indifference to a serious medical need.  Plaintiffs contend that there are material facts in dispute regarding whether Debra was denied medical treatment and whether the officers' conduct was willful and wanton when they refused to call an ambulance after Debra and her relatives asked the officer or officers to call for an ambulance.  Their discussion of this claim briefly states that Defendants are not immune under Illinois statute because the officers' conduct was willful and wanton.  *See* 745 ILCS 10/2-202 (stating that a public employee is not liable for any act or omission in the execution or enforcement of law unless his act or omission constitutes willful and wanton conduct).  They also cite *Torres v. City*

*of Chicago*, 123 F. Supp. 2d 1130, 1133 (N.D. Ill. 2000).  Beyond that, however, they do not present any argument or facts that establish the elements of a claim for denial of medical care.  In fact, they do not even articulate the elements of this claim, nor do they inform the Court what evidence supports each element.

The following facts are undisputed.  Debra was upset and crying as she first walked toward the police car and when she was in the police car.  When she got into the car, she told Officer Leibach that she was having trouble breathing and asked him not to close the door.  He told her she had to get in, but he rolled down the window in response to her request.  The officer then asked her some questions about who was in the van.  (Debra dep., p. 101; Leibach dep., pp. 28-29.)  While Debra was in the police car, she made three cell phone calls, to her sister Cora and her brothers Craig and Al.  She also talked to her husband and family members who were standing on the sidewalk.  (Debra dep., p. 113, "I kept hollering out to him [(Herman)]and talking to him and trying to ask him, see what was going on.")  Although it is undisputed that Debra was very upset and agitated, she never asked the police officers for medical care or to call 911 or an ambulance when she was in the police car.

Officer Leibach let Debra out of the police car immediately after the showup at about 18:15.  (Leibach dep., p. 29.)  Debra testified that when she got out of the police car, she was still very upset, she was having trouble breathing, she was shaking, and her head and chest were hurting.  (Debra dep., p. 112-13.)  Debra was still upset when she was released from the police car, but she did not ask police officers to call 911 or an ambulance.[4]  An officer helped her out of

---

[4]Debra unequivocally testified that she never asked the officers to call an ambulance. (Debra dep., pp. 35, 110.)  Herman believes that she asked for medical assistance when she was released from the police car.  (Herman dep., pp. 14-15, stating that she requested medical assistance "[a]t this time they had let her out of of the back of the police car because she couldn't breathe.  She was feeling like she was going to faint or something.  So they took her out and set her on the ground so that she could relax a little bit better and get some air.  At that time she was asking the officer would they please call an ambulance for her because she couldn't breathe.").  The fact that Debra herself may not have requested medical assistance does not defeat her claim when it is clear that either she, or someone acting on her behalf, did ask for an ambulance.

the police car and helped her sit down on the ground.  (Herman dep., p. 38.)  Herman, Cissilla
(Debra's sister), and Craig (her brother) were standing around her.  (Debra dep., p. 113.)  They
observed that Debra was upset and agitated, and was complaining of feeling faint, difficulty
breathing, dizziness, and chest and head pain.  At this time, no police officers were nearby.
(Cissilla Brown dep., p. 29, stating that when Debra was telling them that she did not feel well
and her head hurt, no officers were around.)  Herman then asked an officer to call an ambulance
and the officer or officers said no.  Then Craig asked an officer or officers to call an ambulance.
The officer or officers continued to say no, or "right now, I can't," but did not explain why.
(Anthony Craig Williams dep., p. 28.)  At that point, Craig called 911 and requested an
ambulance.  The ambulance arrived sometime before 18:29.

Officer Leibach testified that when he released her from the police car, he observed she
was still upset, but he was not aware that she was having chest pains and did not observe that she
had any other condition that warranted an ambulance being brought to the scene.  (Leibach dep.,
pp. 30-31.)  Plaintiffs have presented no evidence that Debra told any officer she was having
chest pains or that she complained of having difficulty breathing after she first got into the police
car when she asked Leibach to leave the door open.

Plaintiff has clarified that her claim regarding medical care is a state law claim of willful
and wanton conduct rather than a constitutional claim.  The elements of a claim for willful and
wanton conduct under Illinois law include "not only duty, breach, and proximate cause, but also
that defendants either intentionally injured [Debra] or acted in reckless disregard for [her]
safety."  *Carter v. Dixon*, 718 F. Supp. 1389, 1390 (N.D. Ill. 1989) (stating what a plaintiff must
allege to state a claim for this particular tort in the context of immunity under 745 ILCS 10/2-
202) (quoting *Scarano v. Town of Ela,* 520 N.E.2d 62, 64 (Ill. App. Ct. 1988)).

The record shows that Debra had access to a cell phone and could have called an
ambulance herself.  In addition, she was able to communicate directly with her relatives who
were standing a few feet away from her and who also had access to telephones.  Under these

32

circumstances, where the police did nothing to restrain or prevent Debra or her family from calling an ambulance and Plaintiff has presented no evidence that any harm arose from the officers' refusal to summon an ambulance, no reasonable jury could conclude that Defendants denied Plaintiff access to medical care.

Plaintiff has failed to *articulate* the elements of her claim, much less present evidence to support each element.  Although a court must give plaintiffs the benefit of the doubt at the motion to dismiss stage (*see Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc.*, 40 F.3d 247, 251 (7th Cir. 1994) (stating that, at the motion to dismiss stage, the plaintiff receives the benefit of imagination so long as the hypotheses are consistent with the allegations of the complaint)), at the summary judgment stage, plaintiffs bear the burden of establishing the elements of their claims.  *Anderson*, 477 U.S. at 250.  The only element that Plaintiffs address is whether the officers' refusal to call an ambulance constitutes willful and wanton conduct.  In an attempt to thoroughly address Plaintiffs' claims, the Court will now consider that particular issue.

Plaintiffs rely on a quote from the *Torres* case as authority for their position that the officers' refusal to call an ambulance constituted willful and wanton conduct.  In *Torres*, the Northern District court stated that, "Illinois courts have consistently held that the failure to provide medical care upon request is willful and wanton."  *Torres*, 123 F. Supp. 2d at 1133 (citing *Singleton v. City of Chi.*, No. 99 C 0059, 2000 WL 224619, *2 (N. D. Ill. Feb 25, 2000) (unreported)).  The *Torres* court overstated the *Singleton* holding.  In *Singleton* (before the court on a motion to dismiss based on immunity under 745 ILCS 10/2-201), the police arrested and detained Antonio Singleton in jail.  During his detention, Singleton "repeatedly asked for his asthma medication or for medical attention to relieve his asthmatic condition.  Later that day, he was taken to St. Bernard's Hospital where he was prescribed, but apparently not given, asthma medication."  *Singleton*, 2000 WL 224619, at *1.  He returned to the lock-up, again without access to his prescribed asthma medication and subsequently died.  *Id*.  Denying the motion to dismiss pursuant to 745 ILCS 10/2-201, the court stated that "[c]ourts have consistently found that actions similar to the alleged conduct [of] the City falls [(*sic*)] within the scope of the

exception for willful and wanton conduct contained in 745 ILCS 10/4-105 (Failure to provide medical care for prisoners)."  *Id.* at *2.

Singleton's medical need was obvious and serious and the police knew about it. Similarly, according to the complaint in *Torres* (*Torres* came before the court on a motion to dismiss), the medical need was serious and obvious and the police were aware of it.  Mr. Rivera was "lying on the ground, bleeding from multiple gunshot wounds, and witnesses to the shooting requested medical assistance when the officers arrived, but the officers waited nearly an hour and a half to call an ambulance."  *Torres*, 123 F. Supp. 2d at 1133.  The court concluded that such conduct demonstrated, at the least, an utter indifference to or conscious disregard for Mr. Rivera's safety.  *Id.*

On its face, the statement from *Torres* that an officer's "failure to provide medical care upon request is willful and wanton" supports Plaintiffs' argument.  However, looking at the context of the case, it is clear that the *Torres* court did not articulate or establish that police officers have a blanket duty to call an ambulance whenever anyone asks for one, nor do *Singleton* or the cases cited therein stand for such a proposition.  A review of those cases shows that implicit in the statement is a serious and obvious medical need of which the police have knowledge.  As a result, the Court cannot conclude that Defendant officers acted willfully and wantonly simply because they did not call an ambulance upon request.

The plain language of Rule 56(c) mandates the entry of summary judgment against a party who fails to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  *Anderson*, 477 U.S. at 250 (stating that "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial").  Based on the record in this case, Plaintiffs have failed to establish that the officers acted willfully and wantonly when they refused to call an ambulance under the circumstances of this case, because they have failed to present evidence (or to raise a genuine dispute of material fact) that Defendants intended to injure Debra or acted with

34

reckless regard for Debra's safety when they refused to call an ambulance.  Moreover, although the Court has reached its conclusion based on Plaintiffs' failure to establish the elements of the claim, in the absence of willful and wanton conduct, Section 2-202 of the Tort Immunity Act (745 ILCS 10/2-202) protects Defendants from liability.  Accordingly, the Court grants summary judgment in favor of Defendants on this claim.

### 3.  IIED

Defendants next argue that Plaintiffs' IIED claims fail because (1) Defendant officers are immune from liability under Illinois law; (2) the officers' conduct was reasonable ad not willful and wanton; and (3) Plaintiffs have presented no evidence that any of them are suffering from severe emotional distress.

The tort of IIED requires proof of four elements:  (1) extreme and outrageous conduct; (2) intent or recklessness to cause emotional distress; (3) severe or extreme emotional distress suffered by the plaintiff; and (4) actual and proximate causation of the emotional distress by defendant's outrageous conduct.  *Sornberger*, 434 F.3d at 1030.

Regarding the first element, the nature of the defendant's conduct, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency . . . ."  *Kleidon v. Rizza Chevrolet, Inc.*, 527 N.E.2d 374, 377 (Ill. App. Ct. 1988) (citing Restatement (second) of Torts, sec. 46, comment d (1965)).

Plaintiffs argue that the officers' acts of pointing guns at Plaintiffs and threatening to shoot them was outrageous because the officers knew that no guns had been involved in the panhandling incident or they failed "to inquire as to whether any weapons had been involved" before pointing guns at Debra.  Given that the stop occurred within five minutes of the initial broadcast regarding the purported robbery, the officers did not have time to do a full investigation before making the stop.  In addition, contrary to Plaintiffs' contention, they did not

35

know at the time of the stop that the panhandling incident involved no weapons.  The officers were following up on what they believed to be a robbery, a serious crime that can involve weapons.  Furthermore, the length and manner of Plaintiffs' detention and the officers' use of force were not unreasonable under the circumstances.  As a result, the Court cannot conclude that the officers' conduct was extreme and outrageous.

As to the second element, severity of the distress, "[t]he law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it."  *Id.* (quoting Restatement (second) of Torts, sec. 46, comment j (1965)).  Courts may consider the intensity and the duration of the distress when determining its severity.  *Id.*

Defendants point out that Rashad stated that he was not scared and now, after the fact, he does not want to have anything to do with the police, but he is not fearful.  Regarding Rashad, Debra stated that she has perceived that he has emotional problems; he has made bad choices, his grades have gotten worse, and he got into a fight with his father.  (Debra dep., pp. 42-45.)  Herman testified that Rashad's moods changed after this event, he quit playing on sports team, his grades dropped.  (Herman dep., pp. 21-26.)  However, even if these things were caused by the incident, in Illinois, a "drop in grades and attitude problems are not evidence of the type of severe distress, unendurable by a reasonable person, that is actionable under Illinois law." *Sornberger*,  434 F.3d at 1030.  Moreover, nothing in the evidence shows that this behavior resulted from the January 18 detention as opposed to arising from the normal strife associated with adolescence.

Regarding Debra's distress, it is undisputed that she was very upset and shaking during the stop, but that is not enough to constitute severe emotional distress.  *See Kleidon,* 527 N.E.2d at 377 ("Although fright, horror, grief, shame, humiliation, *worry*, etc. may fall within the ambit of the term 'emotional distress,' these mental conditions alone are not actionable.").  Debra was taken to the emergency room where she complained of chest pain and shortness of breath.  Dr. Pool's examination indicated increased heart rate, increased respiratory rate, and normal

blood pressure.  He diagnosed her with anxiety and released her without restriction later that evening.  Debra claims that she was traumatized by the event and that she has occasional nervousness and she feels disillusioned by the police.  When asked whether she suffers any emotional problems other than occasional nervousness, she replied:  "Coming down to the police, yes.  I feel hurt, pain.  I don't feel the same like I used to feel like they ought to help you." (Debra dep., p. 40.)  Herman testified that he was only briefly frightened and once he knew his family was safe, he was no longer afraid.  It is unclear whether he has ever taken anxiety medication; if he did, he began to take it around August 2004.

There is no question that an officer who is performing his official duties often causes others to feel uncomfortable.  Inherent in most encounters with police is some distress that rises with the intensity of an encounter.  Considering both intensity and duration in this case, the Court agrees that the encounter was an intense situation, particularly for Debra, for a brief time. However, Plaintiffs' descriptions of their emotions do not constitute distress that is "so severe that no reasonable man could be expected to endure it."  *Kleidon*, 527 N.E.2d at 377. Furthermore, Plaintiffs have presented no evidence that Defendants acted recklessly or intended to cause Debra, Rashad, and Herman distress.  Liability for IIED extends to situations in which there is a high degree of probability that severe emotional distress will follow and the actor goes ahead in conscious disregard of it.  *Id.*

Thus, Plaintiffs have failed to establish the elements of an IIED claim, nor have they established the existence of a dispute of fact regarding those elements.  Therefore the Court grants summary judgment in favor of Defendants on the IIED claims.

### C.  Claims against the City

As to claims against the City, Plaintiffs alleged that the officers' conduct conformed with and was consistent with police department and City policies, customs, and practices (#1, ¶ 24) and that the conduct and the individual Defendants and the City's practices, customs, and policies as administered by the police department use "criteria and methods of administration

that have the effect of subjecting individuals to discriminatory enforcement because of their race" (#1, ¶ 25). In the absence of any further articulation of the claims, the Court relied on the summary judgment motion and Plaintiff's response to conclude that Plaintiffs' claims against Defendant City include (1) liability for all constitutional and state law claims; and (2) failure to train its police officers regarding the appropriate use of force.

Regarding the constitutional claims, the Court has granted summary judgment in favor of Defendants on all constitutional claims, finding that Plaintiffs failed to establish that they were deprived of constitutional rights or that a factual dispute exists regarding the elements of the constitutional claims. Therefore, the City cannot be held liable for the officers' conduct as to those claims. *See Tesch v. County of Greenlake*, 157 F.3d 465, 477 (7th Cir. 1998). Similarly, a failure to train theory requires a finding that the individual officers are liable on the underlying substantive claim. *Id*. (citing *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (*per curiam*), and *Phillips v. City of Milwaukee*, 123 F.3d 586, 597 (7th Cir. 1997)). Because the Court granted summary judgment in favor of Defendant officers on the excessive force claims against them, the City cannot be held liable for failure to train its officers regarding the appropriate use of force.

Regarding the state law claims, the City's liability is based on the doctrine of *respondeat superior*. Because the Court granted summary judgment in Defendants' favor on the state law claims, the City cannot be held liable for their conduct. *See Sank v. Poole,* 596 N.E.2d 1198, 1203 (Ill. App. Ct. 1992) (holding that a municipality cannot be held liable based on *respondeat superior* when a court has made an affirmative finding that the individual officer was not liable); *see also* 745 ILCS 10/2-109 ("A local public entity is not liable for any injury resulting from an act or omission of its employee where the employee is not liable").

**IV.  Summary**

For the reasons stated above, the Court **GRANTS** Defendants' motion for summary judgment **(#54)** on all counts.


ENTER this 15th day of February, 2007.


_____s/ DAVID G. BERNTHAL_____
U.S. MAGISTRATE JUDGE